**Autumn LELOUIS, Plaintiff**

**WESTERN DIRECTORY COMPANY, Robert Malone, and David Young, Defendants.**

**No. CIV.00–1719–JE.**

United States District Court, D. Oregon.

Aug. 10, 2001.

Tom Steenson, Zan Tewksbury, Steenson, Schumann, Tewksbury & Rose, P.C., Portland, OR, for Plaintiff.

Karen M. Vickers, Bonnie Richardson–Kott, Bullivant Houser Bailey, P.C., Portland, OR, for Defendants.

## OPINION AND ORDER

JELDERKS, United States Magistrate Judge.

Plaintiff Autumn LeLouis brings this employment-related action against her former employer, defendant Western Directory Company (Western Directory), and defendants Robert Malone, the President of Western Directory, and David Young, an owner and corporate officer of Western Directory. Defendants have moved to stay all judicial proceedings in this matter and to compel arbitration of all claims. I deny the motion.

## BACKGROUND

Western Directory publishes telephone directories similar to the Yellow Pages, and is expanding into similar ventures on the Internet. In March 1998, Western Directory employed Plaintiff LeLouis as a secretary. She alleges[1] that "[a]lmost immediately after she began her employment, and continuously throughout," LeLouis was sexually harassed by male employees of Western Directory, including defendants Malone and Young.

LeLouis alleges that in March 1998, just two weeks after she began working at Western Directory, Ron Leavell, a sales representative, "grabbed her breast." LeLouis reported the incident to her supervisor, Virgil Treach and, at his suggestion, to defendants Malone and Young. No action was taken in response to that complaint.

Later, on or about March 30, 1998, Leavell again allegedly "made unwelcome and offensive physical contact with LeLouis' private parts" in the workplace. LeLouis told Leavell to stop, and also "reported the incident in writing to her supervisor, and to Malone and Young. Again, no action

was taken in response to LeLouis' complaint." LeLouis further alleges that, during the remainder of her employment at Western Directory, she was harassed repeatedly by Leavell, including repeated "verbal threats to LeLouis that he would hurt her or force her to have sex with him, repeatedly referring to LeLouis in extremely vulgar, lewd, and sexually offensive terms, by trying to grab her private parts, and by forcing her down on a table and putting her in imminent fear of sexual assault."

LeLouis also alleges that she repeatedly was sexually harassed by a second Western Directory sales associate, Greg Gannon. On or about January 18, 1999, in the workplace, Gannon allegedly "touched LeLouis and requested sex from her. When LeLouis refused, Gannon pulled out a weapon, verbally threatened physical harm to LeLouis, and made offensive physical contact with her with the intent to cause her bodily harm."

On or about February 22, 1999, "Gannon held a switchblade to LeLouis' neck, and again threatened to harm her if she would not have sex with him. When LeLouis began crying, he slapped her and threatened to hurt her if she told anyone about the incident. Despite his threats, LeLouis reported the incident to Western [Directory's] management, including Malone and Young. Once again, no action was taken in response to LeLouis' complaint."

On or about July 26, 1999, "Gannon pushed LeLouis up against the wall, slapped her, and referred to her in extremely offensive terms. LeLouis believed Gannon so acted in retaliation for LeLouis having reported his earlier conduct." On or about August 23, 1999, Gannon allegedly "brandished a butterfly knife

---

1. For purposes of this motion, I must assume the substantive allegations in the complaint are true. However, nothing I say should be viewed as expressing an opinion as to the truth or falsity of the serious allegations made against these defendants and other persons.

at LeLouis, opening and closing it in a threatening manner each time she walked by." LeLouis says she reported both incidents to Western Directory's management, including defendants Malone and Young, but they did not redress her complaints.

On or about August 28, 1999, defendant Young allegedly entered "LeLouis' office, closed the door, pulled down his pants and requested oral sex. LeLouis refused, and submitted a written complaint of the incident."

On or about September 27, 1999, defendant Malone allegedly "informed LeLouis that he was tired of her complaints about Leavell and Gannon, implied that she should go ahead and have sex with them, and that she should play along or quit [her job]. Malone also threatened to terminate LeLouis if she did not stop complaining. In response, LeLouis submitted a written complaint."

"On or about November 15, 1999, Young told LeLouis that if she did not stop complaining about sexual harassment, that he would make sure she lost her job. Young told LeLouis that if she didn't like it, she could leave stating, 'don't let the door hit you in the ass on the way out.' '

After being subjected to further sexual harassment, LeLouis resigned on or about February 2, 2000, "as a direct result of the intolerable working conditions and the hostile work environment at Western [Directory]."

██ LeLouis then filed a charge with the EEOC.[2] After an investigation, the EEOC found "there is reasonable cause to believe that there is a violation of Title VII with regard to [LeLouis'] allegations of sexual harassment, hostile work environ-

ment, retaliation and constructive discharge." At some point—the date does not appear in the record—the EEOC issued LeLouis a "right to sue" letter.

LeLouis commenced this action on December 14, 2000. The Amended Complaint asserts Title VII (and parallel state law) claims against Western Directory for sexual harassment and retaliation; a common law wrongful discharge claim against Western Directory; claims for assault, battery, and intentional infliction of severe emotional distress against all defendants; and a wage claim (under both federal and state law) based on earned commissions due LeLouis at the time of her resignation that Western Directory has allegedly refused to pay. LeLouis also asserted a claim for declaratory relief asking this court to declare that a binding arbitration agreement is unenforceable.

Three-and-one-half months after this action was commenced, defendants moved to stay all proceedings and to compel arbitration of all claims, pursuant to a written arbitration agreement.

The circumstances under which LeLouis signed the arbitration agreement do not appear to be seriously disputed. It was signed on or about July 27, 1998[3], almost five months after she had been hired and after LeLouis says she had twice complained to the company's president, defendant Malone, about on-the-job sexual harassment including forcible sexual contact. For purposes of this motion, it is undisputed that LeLouis was told she would be fired unless she signed the arbitration agreement, and the only reason she signed it was to keep her job.

---

**2.** The precise date on which the charge was filed is not in the record before me. The better practice is to plead, in the Complaint, the date on which the charge was filed and on which the right-to-sue letter was issued.

**3.** Malone testified at deposition that he "started in May of '98 looking for an appropriate handbook."

The arbitration agreement is part of a generic employee manual, entitled "Associate Handbook," that defendant Malone purchased on the Internet.[4] Malone did not have this generic agreement reviewed by an attorney to determine if it was lawful or enforceable. The Handbook states in relevant part:

> If an employment dispute arises while you are employed at Western Directory Company, Western Directory Company requests that you agree to submit any such dispute arising out of your employment or the termination of your employment (including, but not limited to, claims of unlawful termination based on race, sex, age, national origin, disability, breach of contract or any other bias prohibited by law) exclusively to binding arbitration under the Federal Arbitration Act, 9 USC, Section 1. Similarly, any disputes arising during your employment involving claims of unlawful discrimination or harassment under federal or state statutes shall be submitted exclusively to binding arbitration under the above provisions. This arbitration shall be the exclusive means of resolving any dispute arising out of your employment or termination from employment by Western Directory Company or you, and no other action can be brought by employees in any court or any forum. By simply accepting or continuing employment with Western Directory Company, you automatically agree that arbitration is the exclusive remedy for all disputes arising out of or related to your employment with Western Directory Company and you agree to waive all rights to a civil court action regarding your employment and the termination of your employment with Western Directory Company; only the arbitrator, and not a judge nor a jury, will decide the dispute.
>
> If you decide to dispute your termination or any other alleged incident during your employment, including but not limited to unlawful discrimination or harassment, you must deliver a written request for arbitration to Western Directory Company within one (1) year from the date of termination, or one (1) year from the date on which the alleged incident(s) or conduct occurred, and respond within fourteen (14) calendar days to each communication regarding the selection of an arbitrator and the scheduling of a hearing. If Western Directory Company does not receive a written request for arbitration from you within one (1) year, of if you do not respond to any communication from Western Directory Company about the arbitration proceedings within fourteen (14) calendar days, you will have waived any right to raise any claims arising out of the termination of your employment with Western Directory Company, or involving claims of unlawful discrimination or harassment, in arbitration and in any court or other forum.
>
> You and Western Directory Company shall each bear respective costs for legal representation at any such arbitration. The cost of the arbitrator and court reporter, if any, shall be shared equally by the parties.

LeLouis signed an acknowledgment form which states:

> My signature on this document acknowledges that I understand the above Arbitration Policy and agree to abide by its conditions. I also acknowledge that I understand my employment is at-will and may be terminated at any time, with or without reason, by either Western

---

**4.** Malone testified at deposition that the only modification he made to the generic manual was to insert "Western Directory Company" in the appropriate places.

Directory Company or myself. I further agree that, in accordance with Western Directory Company's Arbitration Policy, that I will submit any dispute—including but not limited to my termination—arising under or involving my employment with Western Directory Company to binding arbitration within one (1) year from the date the dispute first arose. I agree that arbitration shall be the exclusive forum for resolving all disputes arising out of or involving my employment with Western Directory Company or the termination of that employment. I agree that I will be entitled to legal representation, at my own cost, during arbitration. I further understand that I will be responsible for half of the cost of the arbitrator and any incidental costs of arbitration.

The Associate Handbook also states that the Handbook "is intended to be used as a reference book for informational purposes only and not to be construed as a contract."

## DISCUSSION

██ There is no question that parties may *voluntarily* agree to arbitrate disputes arising between them. It is "this voluntariness" that provides the "bedrock justification" from which arbitration derives its legitimacy as an alternative to the judicial system. *Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal.4th 83, 115, 99 Cal.Rptr.2d 745, 6 P.3d 669, 690 (2000). However, there was nothing voluntary about the arbitration agreement at issue here. LeLouis was told to sign the agreement or else she would be fired.

In *Duffield v. Robertson Stephens & Company*, 144 F.3d 1182 (9th Cir.1998),

the Ninth Circuit held that an employer may not force prospective employees to sign an agreement to arbitrate civil rights claims such as those arising under Title VII. The circumstances here are even more compelling than in *Duffield*. LeLouis was an existing employee, not a new applicant as in *Duffield*. This isn't a case in which binding arbitration was included among the terms of employment at the commencement of the employment relationship.[5] Furthermore, Western Directory compelled LeLouis to sign an arbitration agreement *after* she allegedly had twice complained to the company's president about sexual harassment in the workplace.

The Supreme Court's recent decision in *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001), does not go quite so far as defendants suggest. The narrow question presented in *Circuit City* was whether § 1 of the Federal Arbitration Act (FAA), 9 USC § 1—which excludes from that Act's coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce"—exempts only contracts of employment of workers engaged in transportation, or whether it exempts all contracts of employment within the reach of the Commerce Clause. By a 5–4 vote, the Court adopted the narrower interpretation of the exclusion.

That does not mean, however, that *Duffield* has been overruled. *See Borg–Warner Protective Services Corp. v. EEOC*, 245 F.3d 831, 835 (D.C.Cir.2001) ("We cannot say whether the Ninth Circuit will continue to adhere to *Duffield*" following *Circuit City*). *Duffield* turned upon the interpre-

**5.** Employees often have a greater emotional and financial investment in an existing job than in a hypothetical prospective job. In addition, if LeLouis was fired for refusing to sign the arbitration agreement, she would be required to disclose that firing on future job applications, which might impair her prospects of obtaining other work.

tation of the Civil Rights Act of 1991, enacted by Congress 66 years after the FAA. Moreover, the FAA expressly recognizes that a court may refuse to enforce an arbitration agreement upon "such grounds as exist at law or in equity for the revocation of any contract." 9 USC § 2. The Ninth Circuit could conclude that a "waive your rights or be fired" ultimatum is contrary to public policy. Indeed, the EEOC has asserted that such a requirement is itself a violation of Title VII. *See Borg–Warner*, 245 F.3d at 832–35.

Perhaps *Duffield* eventually will be overruled, but predicting how the Supreme Court will decide a hypothetical future case is an exercise fraught with peril. I also take heed of the Supreme Court's admonition that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). Similarly, this court must adhere to controlling Ninth Circuit precedent unless and until it is clearly abrogated. *Duffield* may be questioned, but it has not been directly or indirectly overruled. In accordance with controlling Ninth Circuit precedent, LeLouis is not required to submit her civil rights claims to binding arbitration given the circumstances under which she was compelled to sign the arbitration agreement.

■ Even if *Duffield* were not controlling precedent, I would reach the same result under the circumstances of this case. Both the FAA, and its Oregon coun-terpart, provide that a court may refuse to enforce an arbitration agreement upon "such grounds as exist at law or in equity for the revocation of any contract." 9 USC § 2; ORS 36.305. One-sided adhesion contracts, foisted upon a party with unequal bargaining power, have long been subjected to special judicial scrutiny.

■ The arbitration agreement that Western Directory forced upon LeLouis is one-sided. LeLouis must submit all her claims to arbitration, but defendants are not obligated to arbitrate any claims they have against LeLouis.[6] As the California Supreme Court recently observed, "an arbitration agreement imposed in an adhesive context lacks basic fairness and mutuality if it requires one contracting party, but not the other, to arbitrate all claims arising out of the same transaction." *Armendariz*, 24 Cal.4th at 120, 99 Cal. Rptr.2d 745, 6 P.3d at 694.

Defendants did not obligate themselves to do anything they were not already obligated to do, or limit their rights in any significant way. Before LeLouis signed the arbitration agreement, she could be fired for any reason, or for no reason at all, and that remained true after she signed the agreement. Defendants could even have ordered her to sign the arbitration agreement, and then fired her five minutes later. The Handbook expressly denies that it is a contract or that it gives LeLouis any rights.

It is one thing for an employer to prospectively alter the wages and benefits of at-will employees, since the employer is generally not obligated to provide such benefits in the first place. It is an entirely different matter for the employer to demand that an employee waive her civil

---

**6.** Defendants also contend that the arbitration agreement encompasses any claims by LeLouis against Malone and Young individually. However, the agreement does not purport to require Malone and Young (or other Western Directory employees) to arbitrate any claims they may have against LeLouis.

rights or be fired.[7] This is especially true in a situation where the employee has already complained about sexual harassment in the workplace.

Western Directory could not compel LeLouis to waive her rights under protective statutes such as the minimum wage and hour laws or OSHA. Neither should Western Directory be permitted to compel LeLouis to waive rights conferred by Congress[8] or by the Constitution, particularly when the claims involve civil rights statutes intended, in large part, to protect employees such as LeLouis from employer misconduct. Moreover, the waiver is not limited to events occurring after the agreement was signed but, instead, operates retroactively.

Defendants argue that there is no substantive difference between arbitration and litigation; it is merely a different forum. Even if that were true,[9] the question is not whether arbitration is an adequate (or even superior) alternative when parties voluntarily choose that forum, but whether Western Directory may force LeLouis to surrender her right to have her claims heard in a court of law under threat of being fired if she declined to "volunteer." I conclude that, under the circumstances of this case, the answer must be no.

LeLouis also points to other aspects of the arbitration agreement that reduce her rights, impose significant obligations that would not be incurred in litigation, or are otherwise slanted in favor of Western Directory. The arbitration agreement imposes a one year statute of limitations, notwithstanding that the applicable state and federal laws provide a longer duration. For instance, the Oregon statute of limitation on the assault, battery, IIED, and wrongful discharge claims is two years, *see* ORS 12.110, and the limitations period for a wage claim is six years. *State ex rel Nilsen v. Ben Jacques Chevrolet Buick,* 16 Or.App. 552, 520 P.2d 366 (1974). With regard to Title VII claims, the window would ordinarily be measured from the date of the EEOC charge, rather than from the commencement of the action. In a court, the "continuing violation" doctrine may also apply to Title VII claims. *See Morgan v. National Passenger Railroad Corp.,* 232 F.3d 1008 (9th Cir.2000), *cert granted,* 533 U.S. 927, 121 S.Ct. 2547, 150 L.Ed.2d 715, 2001 WL 456377 (2001).

Defendants argue that it is unclear that the shorter limitations period will actually make a difference in this case, but the record suggests otherwise. This action was commenced on December 14, 2000, but most of the conduct in question occurred prior to December 1999 and might therefore be barred.[10]

In any event, unconscionability is determined on the basis of the circumstances at the time of contract formation, and whether the agreement was reasonable then.

---

7. The rights at issue are among the most basic in Anglo–American jurisprudence, including the right to trial by jury, an impartial judge, and appellate review.

8. In the Civil Rights Act of 1991, Congress expressly guaranteed the right to a jury trial in a Title VII action that seeks compensatory damages. Pub Law 102–166, § 102, 105 Stat 1071, 1073, codified at 42 USC § 1981a(c)(1).

9. *But Cf.* Schwartz, *Enforcing Small Print to Protect Big Business: Employee and Consumer Rights Claims in an Age of Compelled Arbitra-* tion, 1997 Wis L Rev 33, 59–66 (available empirical evidence supports perception that employers fare much better in arbitration than in litigation). Defendants' fervent insistence upon arbitration suggests they believe it will yield a more favorable outcome for their side.

10. This assumes that the filing of this action is the equivalent of the "written request for arbitration" required by the agreement; otherwise, the one year period may commence at a later (or perhaps earlier) date.

*See W.L. May Co. v. Philco–Ford Corp.,* 273 Or. 701, 707–08, 543 P.2d 283 (1975); *Colonial Leasing Co. v. McIlroy,* 94 Or. App. 273, 765 P.2d 219 (1988). Whether, in hindsight, the outcome in this case would be different is not controlling.[11]

The arbitration agreement also provides that all of LeLouis's claims are waived unless she responds within 14 calendar days to "any communication from Western Directory Company about the arbitration proceeding." No equivalent penalty (or even any penalty) is imposed upon Western Directory if it fails to respond to a communication from LeLouis within 14 calendar days. Again, the absence of mutuality demonstrates the one-sided nature of the arbitration agreement that Western Directory imposed upon LeLouis. In addition, the arbitrator lacks discretion to deem the delay excusable, or to consider whether the particular omission actually warrants forfeiture of all claims.[12] *Cf. Wanderer v. Johnston,* 910 F.2d 652, 656 (9th Cir.1990) (discussing factors court must consider before ordering dismissal of claims as sanction); *Soltani v. Western & Southern Life Ins. Co.,* 258 F.3d 1038 (9th Cir.2001) (ten day notice provision held invalid).[13]

Another concern is whether the arbitrator would have the authority to award the full panoply of remedies, such as punitive damages, the extent of permitted discovery, and whether the arbitrator is required to issue a written decision articulating reasons for the award.[14] *Cf. Armendariz,* 24 Cal.4th at 103, 99 Cal.Rptr.2d 745, 6 P.3d 669 (compulsory arbitration agreement that limits available remedies is invalid), at 104 ("adequate discovery is indispensable for the vindication of" civil rights claims), at 107 (meaningful judicial review is not possible unless the arbitration decision discloses "the essential findings and conclusions on which the award is based").

The arbitration agreement is silent on these issues, hence each of these items turns upon the rules of the particular organization that conducts the arbitration. Various private organizations sponsor arbitration programs, and each has its own rules. However, this generic arbitration agreement purchased on the Internet does not identify the organization that will conduct the arbitration, or which rules will govern, or even establish a procedure for deciding those questions. Consequently, there is no assurance that the arbitration procedures are adequate to vindicate LeLouis's rights.

---

**11.** Some arbitration agreements have sought to impose even shorter deadlines. *Cf. Krahel v. Owens–Brockway Glass Container, Inc.,* 971 F.Supp. 440, 452–53 (D.Or.1997) (declining to enforce binding arbitration provision imposing three day statute of limitations). Of course, nothing precludes two parties from *voluntarily* agreeing to a shorter limitations period, but that is not what transpired here.

**12.** A letter to LeLouis suggesting that the parties skip the lunch break during the arbitration, and have a pizza delivered instead, would seemingly fall into the category of "any communication from Western Directory Company about the arbitration proceeding."

**13.** *Soltani* did uphold a provision establishing a six month statute of limitations, but empha-

sized that the limit was being applied only to state law claims for wrongful termination and unfair business practices. The court did not consider whether an employer may compel an employee to accept a shorter statute of limitations for Title VII claims.

**14.** For instance, the rules of one local arbitration organization, USA & M of Oregon, state that "[u]nless the parties agree otherwise, arbitrators are not required to, and will not, make written opinions or explanations with their awards." Those rules are available at http://www.usam-oregon.com. By contrast, the rules of the American Arbitration Association provide that the decision "shall provide the written reasons for the award unless the parties agree otherwise." AAA National Rules for Resolution of Employment Disputes 34(c).

The arbitration agreement also requires LeLouis to pay one-half the cost of the arbitration proceeding and of the court reporter, and also pay her own "costs for legal representation at any such arbitration." It is unclear whether the latter provision represents an attempt to abrogate any statutory right to recover attorney fees. Notably, the provision does not contain an "unless the law provides otherwise" exception.[15]

With regard to the obligation to pay one-half the cost of arbitration, the exact amount of those costs cannot be determined yet because it is unclear who will conduct the arbitration or what rules will govern. Each organization that sponsors arbitration programs has its own fee schedule. In addition, the cost may vary depending upon the length of the arbitration proceedings, the number of arbitrators (usually one or three), and the hourly fee charged by the arbitrator.

Typically, however, there is an initial filing fee, which may range from $500 up to thousands of dollars and must be paid in advance by the filing party. The parties must also pay an "administrative" fee for each day of the hearing, along with the fee charged by the arbitrator(s) for all time spent in connection with the case. There may also be a charge to rent a hearing room, plus the arbitration agreement requires LeLouis to pay one-half the court reporter's fee. All told, LeLouis's share of the costs of a two-day arbitration might easily exceed four thousand dollars for a single arbitrator (or twice that sum for a three-arbitrator panel), not including any witness fees or travel expenses.[16]

By comparison, the filing fee in federal court is presently $150. The parties do not pay the judge's salary, or to rent the courtroom, or for the court reporter (unless they order a transcript).

The Supreme Court has acknowledged that large arbitration costs may well preclude a litigant from effectively vindicating her federal statutory rights in the arbitral forum. *Green Tree Financial Corp.—Alabama v. Randolph,* 531 U.S. 79, 90–91, 121 S.Ct. 513, 522–23, 148 L.Ed.2d 373 (2000). *See also Armendariz,* 24 Cal.4th at 110, 99 Cal.Rptr.2d 745, 6 P.3d at 687 (prospect

---

**15.** *Cf. Bond v. Pereira–Giron,* 175 Or.App. 496, 29 P.3d 623 (2001) (discussing arbitration panel's determination that arbitration rule allowing a party to be represented by counsel "at his or her own expense" precluded an award of fees even though the underlying contract sued upon specifically provided for an award of attorney fees to the prevailing party).

**16.** The fee schedule of the American Arbitration Association is illustrative. The initial filing fee, payable in advance by the filing party, is determined by the amount of the prayer and whether the claim arises out of an "employer-promulgated plan" or an "individually-negotiated employment agreement ... or "commission sales agreement." American Arbitration Association, National Rules for the Resolution of Employment Disputes (January 1, 2001), available at http://www.adr.org/rules/employment/em-ployment

_rules 2.html. In the former circumstance, the filing fee is $500 for a one-arbitrator panel, and $1500 for a three-arbitrator panel. Each party also pays an "administrative" fee of $150 per hearing day (or $250 for a three-arbitrator panel). The parties must pay the arbitrator(s)' fee, which includes time spent preparing for the hearing. Travel expenses, witness fees, and the court reporter's fee are extra.

If the dispute arises from an "individually-negotiated" employment agreement or commission sales agreement, the initial filing fee varies depending upon the amount of the prayer. If the prayer exceeds $500,000, the initial filing fee is $6,000, plus a "case service fee" of $2,000. If the prayer exceeds $1,000,000—as it might in an employment case, with demands for front pay, back pay, compensatory and punitive damages—the initial filing fee is $8,500 plus a $2,500 case service fee. The cost for the arbitrators, hearing room, court reporter, and other expenses, are extra.

that employees must bear large costs to vindicate civil rights "chills the exercise of that right.") [17]

The *Green Tree* majority declined to decide whether the cost of arbitration was prohibitive in that particular case (or even what showing must be made) because the record was insufficient to establish what costs the plaintiff would incur. The arbitration agreement in *Green Tree* did not specify the proportion of arbitration costs to be borne by the plaintiff, the organization that would conduct the arbitration, or the rules that would govern the arbitration. Consequently, the Court would not only have had to estimate the costs involved, but also had to speculate as to the manner in which those costs were to be divided. In the present case, although the specific fee schedule has not been determined, the allocation of costs is stated in the agreement. Thus, while the precise cost may not be known (and often cannot be known until after the arbitration), this court could make a reasoned estimate of the probable arbitration costs based upon its knowledge of the relevant legal community and of arbitration practices in general.

 Furthermore, the issue here is not just whether the costs in this particular case would deter this particular plaintiff from arbitrating her claims. That could necessitate a fact-intensive inquiry into the plaintiff's assets and ability to pay, whether someone might lend her the money, etc. However, it is neither necessary, nor efficient, for the court to examine such matters for each arbitration agreement. *See Armendariz*, 24 Cal.4th at 111, 99 Cal.Rptr.2d 745, 6 P.3d at 688. The better

approach is that taken by the California Supreme Court in *Armendariz*, which "places the cost of arbitration on the party that imposes it." *Id.* This rule applies only when an employer demands that an employee sign an arbitration agreement; it does not apply to freely negotiated arbitration agreements. *Id.* at 111–12, 99 Cal. Rptr.2d 745, 6 P.3d 669.

The higher cost of arbitration—at least from the plaintiff's perspective—also is significant because it is another example of how this arbitration agreement is slanted to favor Western Directory's interests at the employee's expense. It obligates LeLouis to pay thousands of dollars in costs for an arbitration that only Western Directory desires—costs that LeLouis would not otherwise be obligated to pay—and grants LeLouis nothing in return.

LeLouis has established that she had no meaningful choice whether to sign the arbitration agreement, that the agreement is so one-sided as to be oppressive and unconscionable under the totality of the circumstances, and that to enforce this agreement would undermine the rights Congress sought to protect and vindicate through Title VII and the Civil Rights Act of 1991, as well as the state law rights at issue here.

 Defendants seek to allay this court's concerns by offering to alter the agreement, *e.g.*, by voluntarily paying LeLouis's share of the cost for arbitration, and by waiving the one-year statute of limitation. However, the fairness of a contract must be viewed as of the time the contract was formed. *W.L. May Co.*, 273

---

**17.** It has been suggested that higher arbitration fees are offset by lower attorney fees (because arbitration may be faster, with less motion practice and discovery). However, the majority of civil rights cases appear to be handled on a contingency basis coupled with a fee-shifting statute. It is the defendant, if

anyone, who pays the plaintiff's attorney fees. Typically, the plaintiff pays only for out-of-pocket expenses. Consequently, the higher cost of arbitration fees may pose a significant barrier to plaintiffs, whereas defendants may realize considerable savings from lower attorney fees.

Or. at 707–08, 543 P.2d 283; *Colonial Leasing,* 94 Or.App. 273, 765 P.2d 219. *See also Armendariz,* 24 Cal.4th at 125, 99 Cal.Rptr.2d 745, 6 P.3d at 697 ("No existing rule of contract law permits a party to resuscitate a legally defective contract merely by offering to change it.") Second, this court may not rewrite the contract for the parties, *Usinger v. Campbell,* 280 Or. 751, 755, 572 P.2d 1018 (1977), as would be necessary here.

Third, as in *Armendariz,* there are multiple defects in this arbitration agreement, which strongly suggests a deliberate decision to use the employer's superior bargaining position to obtain an unfair advantage. *Armendariz,* 24 Cal.4th at 124, 99 Cal.Rptr.2d 745, 6 P.3d at 696–97.

Finally, if I were to accept defendants' proposal, employers would have no incentive to ensure that a coerced arbitration agreement is fair to both sides. Instead, the employer could write a one-sided agreement that favors the employer, and then make the bare minimum modifications necessary to obtain the court's approval. *Cf. Armendariz,* 24 Cal.4th at 124, n. 13, 99 Cal.Rptr.2d 745, 6 P.3d at 697, n. 13 (employer will not be deterred from inserting illegal clauses in arbitration agreements if the worst that can happen is that the court will strike the offending clause after the employee has litigated the matter).

Properly used, voluntary arbitration (and other alternative dispute resolution techniques) can be valuable alternatives to litigation. However, the courts must guard against attempts to coerce employees into involuntarily signing arbitration agreements, particularly when—as here— the terms of the arbitration agreement are slanted in favor of the employer or otherwise undermine rights that Congress established for the protection of those employees.

For all of the foregoing reasons, defendants' motion to compel arbitration is denied.

## CONCLUSION

Defendants' Motion (# 11) to Compel Arbitration and Stay Proceedings is DENIED.