Argued and submitted June 20, 2006, on appeal, affirmed; on cross-appeal, reversed and remanded with instructions to enter judgment awarding punitive damages in the amount found by jury January 31, 2007

Panfilo VASQUEZ-LOPEZ
and Maria C. Dominguez,
husband and wife,
*Plaintiffs-Respondents
Cross-Appellants,*

*v.*

BENEFICIAL OREGON, INC.,
dba Beneficial Mortgage Corp.,
a foreign company,
*Defendant-Appellant
Cross-Respondent.*

Multnomah County Circuit Court
021010108; A125270

152 P3d 940

554

Scott G. Seidman argued the cause for appellant-cross-respondent. With him on the briefs were Terry W. Baker, David S. Aman, and Tonkon Torp LLP.

Phil Goldsmith argued the cause for respondents-cross-appellants. With him on the briefs were Maureen Leonard, Mark E. Griffin, and Hope Del Carlo.

David F. Sugerman and Paul & Sugerman, PC, and Deborah M. Zuckerman, Washington, D.C., filed the brief *amicus curiae* for AARP Foundation, National Association of Consumer Advocates, Oregon Consumer League, and Oregon Trial Lawyers Association.

Justin M. Baxter and Baxter & Baxter, LLP, filed the brief *amicus curiae* for United Mexican States.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Kaye E. McDonald, Assistant Attorney General, filed the brief *amicus curiae* for State of Oregon.

Before Schuman, Presiding Judge, and Landau* and Ortega, Judges.

SCHUMAN, P. J.

---

* Landau, J., *vice* Ceniceros, S. J.

**SCHUMAN, P. J.**

Plaintiffs, immigrants who neither read nor speak English, brought this action against defendant Beneficial Oregon, Inc., a mortgage company, alleging that defendant engaged in predatory lending practices by fraudulently inducing them to borrow money at extremely disadvantageous interest rates and lying to them about what their monthly payments would cover. Defendant filed a motion to compel arbitration pursuant to an arbitration rider to the loan contract, but the trial court denied the motion on the ground that the arbitration rider was unconscionable. At the subsequent trial, the jury found in favor of plaintiffs and awarded them economic, noneconomic, and punitive damages, as well as attorney fees. The court remitted the punitive damages award, lowering it from $500,000 to $237,592.50.

Defendant appeals, assigning error to four trial court rulings: the denial of defendant's motion to compel arbitration; the grant of a directed verdict against two of defendant's affirmative defenses; the failure to further remit the punitive damages award to $100,000; and the award of enhanced attorney fees.[1] Plaintiffs cross-appeal, arguing that the punitive damages award should not have been remitted at all. We hold that the court correctly ruled that the arbitration rider was unconscionable and that defendant's affirmative defenses lacked merit as a matter of law. Regarding punitive damages, we hold that the trial court erred in remitting the jury's award. Finally, we hold that the trial court did not abuse its discretion in its award of enhanced attorney fees. We therefore affirm on appeal and, on cross-appeal, we reverse and remand.

## I. FACTS

The following facts are either uncontested or, where contested, consistent with the court's and the jury's conclusions. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). Plaintiffs, who are husband and wife, immigrated to the

---

[1] Defendant concedes that plaintiffs presented sufficient evidence to allow the jury to find that defendant caused plaintiffs to enter into the loan transaction by misrepresenting its terms.

United States from Mexico in the late 1980s. Since that time, both have worked in the same Portland factory, where, at the time of trial, each earned approximately $7.75 per hour. With help from family and friends, plaintiffs purchased a house in 1996. In 1999, after consulting with Ferran, a Spanish-speaking mortgage consultant known in the Latino community and not affiliated with defendant, they were able to refinance their home through Continental Savings Bank at a yearly interest rate of seven percent, which was lower than the interest rate on their original loan. The Continental loan was a prime loan, which reflected plaintiffs' favorable credit rating. Their monthly payment on the Continental loan was $612.08 plus an additional amount to pay mortgage insurance and taxes.

After lending plaintiffs money to finance the purchase of a vacuum cleaner, defendant began sending them advertisements for home loans. In the fall of 2000, because plaintiffs were in need of a new roof for their home, they contacted defendant for an appointment, hoping to obtain between $5,000 and $6,000 in financing. They met with senior account executive Joel Higgins, also a native of Mexico, who explained to plaintiffs in Spanish that they would be wise to obtain a second mortgage large enough to cover both the roof and other outstanding debts, allowing them to make only one payment per month. As a result, plaintiffs received a second mortgage from defendant in the amount of $17,948.44. The annual interest rate on that second mortgage was 23.23 percent.

Shortly thereafter, in January 2001, Higgins advised plaintiffs that they could refinance their first mortgage and consolidate it with their second mortgage. Based on Higgins's representations about the new loan, plaintiffs believed that the interest rate would be lower than the rate they were then paying on their existing mortgages and that, if plaintiffs were to divide their monthly payment into two payments per month, their interest rate would drop even lower and they would pay off the balance of the loan in 17 years, as opposed to the standard 30 years. Higgins also told plaintiffs that their monthly payment would remain the same and that automatic payments for insurance and taxes

would continue. Because they understood defendant's refinancing terms to be more favorable than those of their loan through Continental, plaintiffs were "convinced" by Higgins to enter the new loan arrangement. According to plaintiffs, Higgins reviewed with them the documents—all of which were in English—without explanation of the interest rate. The annual interest rate on the loan from defendant was 12.987 percent, and the monthly payment, without any withholding for property taxes or insurance, was $1,212.36.

Defendant's "Loan Repayment and Security Agreement" included an arbitration rider that provided, in part:

> "By signing this Arbitration Rider, you agree that either Lender or you may request that any claim, dispute, or controversy (whether based upon contract; tort, intentional or otherwise; constitution; statute; common law; or equity and whether pre-existing, present or future), including initial claims, counter-claims, and third party claims, arising from or relating to this Agreement * * *, including the validity or enforceability of this arbitration clause, any part thereof or the entire Agreement ('Claim'), shall be resolved, upon the election of you or us, by binding arbitration * * *.

> "* * * * *

> "If you file a Claim, the filing costs shall be paid as follows: (a) Lender agrees to pay for the initial cost of filing the Claim up to the maximum amount $100.00[.] * * * The cost of up to one full day of arbitration hearings will be shared equally between us. Fees for hearings that exceed one day will be paid by the requesting party."

The arbitration rider required that any award resulting from arbitration "shall be kept confidential," and it prohibited class action claims. Like the rest of the "Loan Repayment and Security Agreement," it was written in English. Higgins explained some, but not all, of the terms of the arbitration rider to plaintiffs; he told them that the agreement required them to arbitrate any disputes, but that they "could go to court after going through arbitration."

In January 2002, plaintiffs received a bill from Multnomah County showing that they owed money for their property taxes. Plaintiffs consulted a family member, who translated the bill. They then sought advice from Ferran, the

mortgage consultant who had helped plaintiffs with their Continental loan. Ferran explained the terms of the loan from defendant, at which point plaintiffs for the first time understood several of its disadvantageous terms. She recommended that plaintiffs pay the tax bill quickly. To further that objective, she helped plaintiffs find refinancing for their mortgage loan again, this time through Homestreet Bank, with a yearly interest rate of seven percent and an established escrow account for property taxes and insurance.

Thereafter, plaintiffs filed suit against defendant, claiming, among other things, that defendant, through Higgins, told them that the interest rate was at most 7.8 percent when he knew it was actually much higher, and told them that the monthly payment included taxes and insurance when he knew that it did not. Defendant's answer included a number of affirmative defenses, including two that were based on allegations that plaintiffs, by giving defendant inaccurate tax returns, fraudulently induced defendant into making the loan. Defendant filed a motion to compel arbitration pursuant to the arbitration rider, but the trial court denied the motion on the ground that the arbitration agreement was unconscionable and therefore unenforceable.

A jury trial ensued. At the close of the evidence, plaintiffs moved for and were granted a directed verdict against defendant's affirmative defenses. The jury subsequently returned a verdict awarding plaintiffs $26,639.73 in economic damages, $5,000 in noneconomic damages, and $500,000 in punitive damages on their fraud claim, in addition to $28,544 in money damages on their claim under 15 USC sections 1635 to 1640, provisions of the federal Truth in Lending Act (TILA). Defendant then filed a motion for a new trial on the basis of its affirmative defenses and a motion to remit the punitive damages award to $100,000. The court denied the motion for a new trial but partially allowed the motion to remit, reducing the punitive damages in a supplemental judgment to $237,592.50. A second supplemental judgment was thereafter issued awarding plaintiffs $182,107.50 in attorney fees under their TILA claim, to which defendant unsuccessfully objected. This appeal and cross-appeal followed.

## II. ENFORCEABILITY OF THE ARBITRATION RIDER

■      We begin with defendant's argument that the court erred in denying the motion to compel arbitration. The parties agree that plaintiffs' claims fall within the terms of the arbitration agreement; that the Federal Arbitration Act, 9 USC sections 1 to 16 (FAA), controls the outcome, *see Southland Corp. v. Keating*, 465 US 1, 104 S Ct 852, 79 L Ed 2d 1 (1984) (FAA applies in state court); and that, under section 2 of the FAA, an arbitration agreement may be challenged in state court "upon such grounds as exist at [state] law or in equity for the revocation of any contract," including unconscionability. The parties disagree, however, about the proper forum in which to challenge the validity of an arbitration agreement by asserting its unconscionability and about whether the agreement in this case is unconscionable. Plaintiffs contend that the trial court correctly determined that the issue should be decided by the court, and that the court correctly decided that the arbitration rider was unconscionable and therefore unenforceable. Defendant argues that the issue of the arbitration clause's validity should have been submitted to the arbitrator, and that, in any event, even if the court was the proper forum, it erred in deciding that the arbitration agreement was unconscionable.

A.   *Who decides whether the arbitration rider is enforceable?*

The outcome of the dispute about the proper forum depends on how we interpret two United States Supreme Court cases: *Prima Paint v. Flood & Conklin*, 388 US 395, 87 S Ct 1801, 18 L Ed 2d 1270 (1967), and *Buckeye Check Cashing, Inc. v. Cardegna*, 546 US 440, 126 S Ct 1204, 163 L Ed 2d 1038 (2006). In *Prima Paint*, the parties entered into a contract under which Flood & Conklin (F & C) was to provide consulting services to Prima Paint, in return for which Prima Paint would pay F & C a percentage of its receipts. *Prima Paint*, 388 US at 397. The contract contained an arbitration clause. *Id.* at 398. Prima Paint received information that F & C was insolvent; instead of paying F & C, Prima Paint deposited the payment into an escrow account and notified F & C that, in Prima Paint's opinion, F & C had secured the contract through a fraudulent inducement. *Id.*

F & C served Prima Paint with a "notice of intention to arbitrate"; Prima Paint then filed suit seeking rescission on the basis of fraudulent inducement and, at the same time, petitioned the court to enjoin F & C from proceeding to arbitration, arguing that the arbitration agreement had been fraudulently induced and was therefore unenforceable. *Id.* at 398-99. F & C, for its part, cross-moved to stay the court proceedings, pending arbitration, with the arbitrator empowered to decide whether the arbitration agreement was valid. *Id.* at 399. The District Court granted F & C's cross-motion, and the Second Circuit Court of Appeals dismissed Prima Paint's appeal.

The Supreme Court affirmed. Relying on section 4 of the FAA, the Court explained that a trial court

"is instructed to order arbitration to proceed once it is satisfied that 'the making of the agreement for arbitration or the failure to comply [with the arbitration agreement] is not in issue.' [9 USC § 4.] Accordingly, if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate— the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally. * * * We hold, therefore, that in passing upon [an] application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate. In so concluding, we not only honor the plain meaning of the statute but also the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts."

*Id.* at 403-04 (footnotes omitted). The Court then held that the trial court did not err in letting the case go to arbitration because, "In the present case, no claim has been advanced by Prima Paint that F & C fraudulently induced it to enter into the agreement to arbitrate." *Id.* at 406. Thus, the teaching of *Prima Paint* appears to be that a challenge to the validity of an arbitration agreement may be adjudicated by the court only when that challenge is based on a *legal theory* that applies solely to the arbitration clause; if the challenge is

based on a legal theory that applies to the entire contract, it goes to the arbitrator.

After the trial court's decision in this case, the United States Supreme Court examined once again the question "whether a court or an arbitrator should consider the claim that a contract containing an arbitration provision is void for illegality." *Buckeye*, 546 US at 442. In that case, two borrowers sued a payday loan company, alleging usurious interest rates and violations of Florida consumer protection laws; the loan company then moved to compel arbitration pursuant to a clause in the loan agreement. *Id.* at 443. The trial court denied the motion, and the Florida Supreme Court ultimately affirmed that decision. *Id.* As had several state and federal courts in the wake of *Prima Paint*, the Florida court had held that the *Prima Paint* rule did not extend to situations in which the contract containing the arbitration clause was alleged to be void as opposed to merely voidable. *Id.*

■    The Supreme Court rejected that reasoning, holding that, under *Prima Paint*, it was "irrelevant." *Buckeye*, 546 US at 446. The Court explained:

"Challenges to the validity of arbitration agreements * * * can be divided into two types. One type challenges specifically the validity of the agreement to arbitrate. The other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid. Respondents' claim is of this second type. The crux of the complaint is that the contract as a whole (including its arbitration provision) is rendered invalid by the usurious finance charge."

*Id.* at 444 (citation and footnote omitted). The Court characterized its holding as a "reaffirm[ation]" of the *Prima Paint* rule, which it stated as follows: "[A] challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." *Id.* at 449.

■    Although the Court in *Buckeye* stated that the case reaffirms *Prima Paint*, it also appears to add a significant gloss to that earlier case. While *Prima Paint* focused on the

legal theory asserted in the claim, *Buckeye* focused on the scope of the claim: if the claim is directed solely at the arbitration agreement, then the court can decide the validity of the arbitration clause, but if the claim is directed at "the contract as a whole (including its arbitration provision)," then the arbitrator decides the validity of the arbitration clause. Read together, the cases establish that the court is the proper forum if the claim addresses only the arbitration clause or if it addresses the arbitration clause under a legal theory that is different from the theory that it deploys to challenge the entire contract.

Neither case, however, directly addresses a related issue: What is "the claim" to which the rule applies? At least two answers are plausible. "The claim" might refer to the complex of issues that the plaintiff raises in the complaint or other pleadings. Alternatively, the term might refer to all of the issues that are properly before the trial court when it is called on to decide whether to compel arbitration, whether those issues arise from pleadings or from subsequent motions.

That question is dispositive in the present case. If "the claim" refers only to pleadings, the court erred. The legal theories in plaintiffs' pleadings did not challenge or otherwise implicate the arbitration clause. The complaint contained two relevant claims.[2] The first, for "Misrepresentation," alleged that defendant "made * * * false verbal representations" by telling plaintiffs that the interest rate would be fixed at no more than 7.8 percent when in fact it was much higher and by telling them that their monthly mortgage payment included taxes and insurance. The second claim, "Truth in Lending Act," alleged that defendant "failed to clearly and conspicuously·deliver all material disclosures required by TILA" by making the same false representations

---

[2] Two additional claims are unrelated to the loan contract *per se*; rather, they deal with defendant's actions after plaintiffs paid off the loan. They are not related to this appeal. The third claim alleged that, in violation of ORS 86.720(1), defendant failed to effectuate the reconveyance to plaintiffs of the estate of real property that had secured the loan. The fourth claim (unjust enrichment) alleged that defendant unlawfully continued to withdraw and retain funds from plaintiffs' checking account after the loan was paid off.

alleged in the first complaint. Thus, if "the claim" as conceived by the Court means only those claims pleaded in the complaint, the case should have gone to arbitration, because "the claim" did not challenge the arbitration clause at all. The challenge to the arbitration rider arose only in response to defendant's motion to compel.

On the other hand, if "the claim" as conceived by the Court includes all of the issues properly before a court when it makes the decision whether to compel arbitration, then the trial court did not err. The gravamen of the relevant claims in the complaint—common-law misrepresentation, and misrepresentation under TILA—is that defendant concealed the truth from plaintiffs. The "claim" against the arbitration rider, on the other hand, is that it is unconscionable. Although, as we discuss below, deception in the process of contract formation can play a role in determining whether a contract or contractual provision is unconscionable, the "primary focus" of an unconscionability claim is not whether a party to a contract was deceived about what the terms were; rather, it is whether one party was disadvantaged by a "substantial disparity in bargaining power combined with terms that are unreasonably favorable to the party with the greater power." *Carey v. Lincoln Loan Co.*, 203 Or App 399, 422, 125 P3d 814 (2005), *rev allowed*, 341 Or 449 (2006). Thus, although there is some minor overlap between the legal theory deployed against the substantive terms of the loan contract and the theory deployed against the arbitration rider, the two theories are for all intents and purposes distinct. For that reason, if "the claim" encompasses all of the assertions properly before the trial court when it makes the decision whether to stay proceedings, then the court properly denied the motion to compel under *Prima Paint* and *Buckeye*.

One phrase in *Buckeye* indicates that the proper frame of reference is the complaint. After dividing the universe of claims into two categories, the Court explains, "Respondents' *claim* is of this second type. The crux of the *complaint* is that the contract as a whole (including its arbitration provision) is rendered invalid by the usurious finance charge." 546 US at 444 (emphasis added). Further, as a term of art, "claim" sometimes refers to particular specifications within a complaint. *See, e.g.*, ORCP 13 A ("The pleadings are

the written statements by the parties of the facts constituting their respective *claims* and defenses." (Emphasis added.)).

However, we find these indications unpersuasive. The reference to the respondents' "complaint" in *Buckeye* is offset by other references in the opinion to a plaintiff's "challenge" to an arbitration clause. *Buckeye*, 546 US at 444-49 (containing 15 references to the respondents' "challenge"). Further, the term "claim" generally encompasses more than the particular allegations contained in a complaint; the relevant definitions in *Black's Law Dictionary* are "[t]he aggregate of operative facts giving rise to a right enforceable by a court" and "[a]n interest or remedy recognized at law; the means by which a person can obtain a privilege, possession, or enjoyment of a right or thing." *Black's Law Dictionary* 264 (8th ed 2004). These definitions would include plaintiffs' assertion that they are entitled to be freed from the binding effect of the arbitration clause, regardless of when, in the litigation process, they make that assertion.

We also note that, in *Prima Paint*, the Court explained that the rule derives from the text of 9 USC section 4: "Under § 4, * * * the federal court is instructed to order arbitration to proceed once it is satisfied that 'the making of the agreement for arbitration * * * is not *in issue*.' " *Id.* at 403 (emphasis added). That language strongly suggests that, under the *Prima Paint* rule, the trial court should focus on what is *in issue* at the time it is called on to decide whether to stay proceedings pending arbitration, and not merely on the complaint and other pleadings. Finally, in both *Prima Paint* and *Buckeye*, the Court appeared to imply that, in determining whether the plaintiffs' "claim" focused on the contract generally or on the arbitration clause itself, the proper frame of reference includes not merely the pleadings, but subsequently filed motions as well. In both cases, the challenge to the arbitration clause arose not in the complaint but in subsequently filed motions to compel arbitration. The Court nonetheless implied that, if the challenge to the arbitration clauses had been distinct, the trial court could have decided arbitrability itself, despite the fact that the claim against the arbitration clauses arose after the pleadings. Had the Court believed that the focus was exclusively on the complaint, it could easily have disposed of both cases on that ground.

For the foregoing reasons, we conclude that the proper focus in applying the *Prima Paint* and *Buckeye* rule is the entire set of issues properly before the trial court at the time it is called upon to determine arbitrability, and not merely the pleadings. The trial court, properly considering the issues raised in plaintiffs' complaint as well as its response to the motion to compel arbitration, properly concluded that the challenge to the arbitration agreement was distinct from the challenges to the substantive provisions of the contract. For that reason, the court did not err in deciding the validity of the arbitration rider instead of staying proceedings while the arbitrator decided it. *Accord Jenkins v. First American Cash Advance of Georgia*, 400 F3d 868 (11th Cir 2005), *cert den*, 546 US 1214 (2006); *Luna v. Household Finance Corp. III*, 236 F Supp 2d 1166 (WD Wash 2002); *ACORN v. Household Intern., Inc.*, 211 F Supp 2d 1160 (ND Cal 2002); *contra Arellano v. Household Finance Corp.*, 2002 WL 221604 (ND Ill Feb 3, 2002).

B. *Is the arbitration rider unconscionable?*

1. *Unconscionability in Oregon law*

■ The facts underlying a determination of unconscionability are reviewed for any evidence and, in this case, are undisputed. Whether those facts constitute unconscionability is a question of law to be assessed on the basis of facts in existence at the time the contract was made. *Best v. U. S. National Bank*, 303 Or 557, 560, 739 P2d 554 (1987).

Unconscionability in Oregon, as elsewhere, has both a procedural and a substantive component. *W. L. May Co. v. Philco-Ford Corp.*, 273 Or 701, 707-08, 543 P2d 283 (1975); *Dex Media, Inc. v. National Management Services*, 210 Or App 376, 387 n 4, 150 P3d 1093 (2007); *Carey*, 203 Or App at 422-23. Procedural unconscionability generally refers to the conditions of contract formation and

> "focuses on two factors: oppression and surprise. Oppression arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice. Surprise involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the terms."

*ACORN*, 211 F Supp 2d at 1168 (invalidating under California law an arbitration rider identical to the one in this case) (internal quotation marks and citations omitted). Substantive unconscionability generally refers to the terms of the contract as opposed to the circumstances of formation and "focuses on the one-sided nature of the substantive terms." *Id.* at 1169. In some jurisdictions, unconscionability requires both components. *See, e.g., id.* at 1168. In others, the courts may invalidate a contract or a contract term on either procedural or substantive grounds. *See, e.g., Luna*, 236 F Supp 2d at 1174 (invalidating under Washington law an arbitration rider identical to the one in this case). Oregon has not adopted a formal template. Rather, this court has described the analysis as follows:

> "The primary focus * * * appears to be relatively clear: substantial disparity in bargaining power, combined with terms that are unreasonably favorable to the party with the greater power may result in a contract or contractual provision being unconscionable. Unconscionability may involve deception, compulsion, or lack of genuine consent, although usually not to the extent that would justify rescission under the principles applicable to that remedy. The substantive fairness of the challenged terms is always an essential issue."

*Carey*, 203 Or App at 422-23; *accord Dex Media, Inc.*, 210 Or App at 387 n 4. Thus, both procedural and substantive unconscionability are relevant, although only substantive unconscionability is absolutely necessary. With that proviso, each case is decided on its own unique facts.

### 2. *Procedural unconscionability: Disparity in bargaining power*

The circumstances under which the contract in this case was formed strongly suggest unconscionability. Plaintiffs were given a standard form "take it or leave it" contract drafted by defendant—a classic contract of adhesion, *Reeves v. Chem Industrial Co.*, 262 Or 95, 100-01, 495 P2d 729 (1972) (defining adhesion contract), which, in some jurisdictions, is *per se* procedurally unconscionable, *see, e.g., Ting v. AT&T*, 319 F3d 1126, 1148 (9th Cir), *cert den*, 540 US 811 (2003) (California). Even if defendant had countenanced the

possibility of allowing particular borrowers such as plaintiffs to bargain for changes to individual terms—a supposition for which there is no support in the record or in common experience—plaintiffs had neither the ability nor the motivation to do so. They lacked ability because the contract was in a language that they did not understand, and they lacked motivation because defendant misled them into thinking that the terms expressed in that language were favorable.

Further, the trial court found as fact (and evidence supports the finding) that plaintiffs "were not told that the arbitration would be binding." Instead, they were fundamentally misled by a half-truth: they were told that they could "go to court after submitting to arbitration." Although Oregon statutes do provide that the losing party in an arbitration has the opportunity to "go to court" afterward, the grounds for obtaining the vacation of an award are extremely narrow in comparison with the scope of review available to litigants in court.[3] Thus, the circumstances of contract formation in this case involved both oppression and surprise.

Defendant argues that the legal significance of plaintiffs' inability to understand English should be discounted for two reasons: first, because defendant, as a nonfiduciary, had no duty to explain the terms to plaintiffs; and,

---

[3] ORS 36.705 establishes the only grounds for vacating an arbitration award:

"(1) Upon petition to the court by a party to an arbitration proceeding, the court shall vacate an award made in the arbitration proceeding if:

"(a) The award was procured by corruption, fraud or other undue means;

"(b) There was:

"(A) Evident partiality by an arbitrator appointed as a neutral arbitrator;

"(B) Corruption by an arbitrator; or

"(C) Misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding;

"(c) An arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to consider evidence material to the controversy or otherwise conducted the hearing contrary to ORS 36.665 so as to prejudice substantially the rights of a party to the arbitration proceeding;

"(d) An arbitrator exceeded the arbitrator's powers;

"(e) There was no agreement to arbitrate * * *; or

"(f) The arbitration was conducted without proper notice of the initiation of an arbitration as required in ORS 36.635 so as to prejudice substantially the rights of a party to the arbitration proceeding."

second, because plaintiffs had a three-day "cooling off" period before the contract was final. The first argument is meritless. As defendant surely recognizes, there is a significant legal difference between a duty to explain and a duty to refrain from lying. The second argument has some force, but not much: it amounts to defendant's contention that there is nothing unconscionable in lying to customers or clients if the lie does not become binding for three days. All things considered, we conclude that, because the parties had unequal bargaining power and because defendant affirmatively concealed the arbitration rider's terms, the arbitration rider was to some significant degree procedurally unconscionable.

### 3. *Substantive unconscionability: Unreasonable terms*

By itself, that fact would not necessarily render the arbitration rider unenforceable. Under Oregon law, as noted above, procedural unconscionability is relevant, but the emphasis is clearly on substantive unconscionability: "The substantive fairness of the challenged terms is always an essential issue." *Carey*, 203 Or App at 423. Here, plaintiffs' case for the substantive unconscionability of the arbitration rider rests on the argument that three of its terms are unreasonably favorable to defendant: the class action ban, the cost-splitting provision, and the confidentiality requirement.

### a. Class action ban

On its face, the class action ban applies equally to plaintiffs and defendant:

> "No class actions or joiner [*sic*] or consolidation of any Claim with the claim of any other person are [*sic*] permitted in arbitration without the written consent of you and us."

We are reminded of the observation by a character in an Anatole France novel that "the majestic equality of the laws * * * forbid[s] rich and poor alike to sleep under the bridges, to beg in the streets, and to steal their bread." Anatole France, *The Red Lily*, 95 (Winifred Stephens trans., Frederic Chapman Ed. 1894). Although the arbitration rider with majestic equality forbids lenders as well as borrowers from bringing class actions, the likelihood of the lender seeking to do so against its own customers is as likely as the rich seeking to sleep under bridges.

Further, the opportunity that the class action ban denies to borrowers is, in many instances, a crucial one, without which many meritorious claims would simply not be filed. As the United States Supreme Court has noted, " 'The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.' " *Amchem Products, Inc. v. Windsor*, 521 US 591, 617, 117 S Ct 2231, 138 L Ed 2d 689 (1997) (quoting *Mace v. Van Ru Credit Corp.*, 109 F3d 338, 344 (7th Cir 1997)); *accord Deposit Guaranty Nat. Bank v. Roper*, 445 US 326, 338, 100 S Ct 1166, 63 L Ed 2d 427 (1980) ("[A class action] may motivate [plaintiffs] to bring cases that for economic reasons might not be brought otherwise, [thereby] vindicating the rights of individuals who otherwise might not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost."). We find the observation by then-Justice Mosk of the California Supreme Court to be as trenchant and as relevant today as it was when he wrote it 35 years ago:

> "Frequently numerous consumers are exposed to the same dubious practice by the same seller so that proof of the prevalence of the practice as to one consumer would provide proof for all. Individual actions by each of the defrauded consumers is often impracticable because the amount of individual recovery would be insufficient to justify bringing a separate action; thus an unscrupulous seller retains the benefits of its wrongful conduct."

*Vasquez v. Superior Court of San Joaquin County*, 4 Cal 3d 800, 808, 94 Cal Rptr 796, 484 P2d 964, 968-69 (1971).

Defendant contends that the class action ban is not unconscionable for four reasons: First, it argues, even if individual plaintiffs are unlikely to bring small claims to an arbitral forum, defendant still remains vulnerable to consumer protection actions by the Oregon Department of Justice; second, class actions are cumbersome and it is therefore impractical to resolve them in arbitration; third, TILA provides for attorney fees for prevailing plaintiffs, so borrowers with small claims will be able to vindicate their rights despite the cost of arbitration; and fourth, the ban is irrelevant to plaintiffs' claim because they did not file a class action.

We find none of these arguments to be persuasive. As the Attorney General points out in an *amicus curiae* brief for the State of Oregon, the Department of Justice cannot represent private individual plaintiffs, even those seeking class relief. *See* ORS 180.060. Nor has an Oregon appellate court held that either the Unfair Trade Practices Act, ORS 646.605 to 646.652, or the Consumer Finance Act, ORS 725.010 to 725.910, provides for actions of the type that might serve as an analog to a class action against a predatory lender. Further, the Attorney General observes that the amount of consumer fraud in the state far exceeds the Department of Justice's ability to investigate and prosecute it; therefore, the possibility of state action cannot reliably serve as a substitute for private actions.

Regarding the unsuitability of class actions in arbitral fora, we note that the United States Supreme Court has observed that class-wide relief may be sought in arbitration. *Green Tree Financial Corp. v. Bazzle*, 539 US 444, 452-53, 123 S Ct 2402, 156 L Ed 2d 414 (2003). Further, all three of the arbitration services specified in defendant's arbitration rider have procedures for handling class actions.[4] We agree with the court in *Discover Bank v. Superior Court*, 36 Cal 4th 148, 172, 113 P3d 1100, 1116, 30 Cal Rptr 3d 76 (2005), that "classwide arbitrations are workable and appropriate in some cases."

With respect to the argument that attorney fees under TILA provide adequate incentive for small-stake plaintiffs to pursue claims against defendant through arbitration, we are simply unconvinced that any significant number of plaintiffs with claims of under, say, $50.00, would be sufficiently motivated to spend the time and risk the expense necessary to take the claim to arbitration. Finally, the fact that plaintiffs have not filed a class action is irrelevant; the unconscionability of a contract is gauged as of the time it is

---

[4] *See* American Arbitration Association, *American Arbitration Policy on Class Actions* (2005), http://www.adr.org/Classarbitrationpolicy (AAA class action procedures); National Arbitration Forum, *Code of Procedure* 20 (2006), http://www.adrforum.com/users/naf/resources/20060501CodeOfProcedure072106.pdf (National Arbitration Forum rule permitting consolidation of claims); JAMS, *Class Action Mass Tort* (last visited Jan 24, 2007), http://www.jamsadr.com/welcome/class.asp (JAMS/Endispute class action procedures).

formed. *Best*, 303 Or at 560. In short, the class action ban is unilateral in effect and, more significantly, it gives defendant a virtual license to commit, with impunity, millions of dollars' worth of small-scale fraud.

### b. Cost-sharing

The unconscionability of the arbitration rider's class action provision is magnified by its cost-sharing provision:

> "If Lender files a Claim, Lender shall pay all the filing costs. If you file a Claim, the filing costs shall be paid as follows: (a) Lender agrees to pay for the initial cost of the [*sic*] filing the Claim up to the maximum amount [of] $100.00; (b) for the filing costs over $100.00, such additional cost shall be divided equally between us up to the amount charged by the arbitration administrator for a Claim equal to your loan amount; and (c) all costs over the amount charged by the arbitration administrator for a Claim equal to your loan amount shall be paid by you. The cost of up to one full day of arbitration hearings will be shared equally between us. Fees for hearings that exceed one day will be paid by the requesting party."

The trial court found this provision unconscionable on the basis of plaintiffs' uncontradicted affidavit demonstrating that, by the second hour of the second day of arbitration, they would owe $1,000 in arbitration fees and that, with their current earnings and expenses, they would need six months to save that amount of money. Defendant does not dispute those facts. Rather, it argues that the cost-sharing provision cannot be unconscionable because defendant volunteered during litigation to waive the provision and pay costs itself, and, in any event, plaintiffs failed to demonstrate that the cost of arbitration would be larger than the cost of pursuing their claim in court. Plaintiffs respond that defendant's offer to waive the cost of arbitration after the case began is irrelevant in light of the rule that unconscionability is gauged as of the time of contract formation and that, regardless, they adequately demonstrated that arbitration would be significantly more expensive than a trial.

Defendant's first argument is transparently meritless. Oregon law clearly establishes that unconscionability

"applies to contract terms rather than to contract performance." *Best*, 303 Or at 560. Thus, defendant cannot rehabilitate an unconscionable contract term long after the contract has been in effect and a dispute as to that term has arisen. Otherwise, defendant would be free to proffer standard form contracts filled with unconscionable terms and "then make the bare minimum modifications necessary to obtain the court's approval." *LeLouis v. Western Directory Co.*, 230 F Supp 2d 1214, 1225 (D Or 2001); *accord Morrison v. Circuit City Stores, Inc.*, 317 F3d 646, 676-77 (6th Cir 2003).

■     Defendant's second argument—that plaintiffs have not shown that the cost of arbitration is prohibitive—is similarly unpersuasive. An arbitration agreement is unenforceable under the FAA if it denies a litigant the opportunity to vindicate his or her rights in the arbitral forum. *Green Tree Financial Corp.-Ala. v. Randolph*, 531 US 79, 90, 121 S Ct 513, 148 L Ed 2d 373 (2000). As the Court has noted, "[i]t may well be that the existence of large arbitration costs" effects such a denial. *Id.*[5] Most courts considering the question have held that it does. *See, e.g., Ting*, 319 F3d at 1151 (applying California law); *Morrison*, 317 F3d at 663 (applying Tennessee law); *Circuit City Stores, Inc. v. Adams*, 279 F3d 889 (9th Cir), *cert den*, 535 US 1112 (2002) (applying California law); *Luna*, 236 F Supp 2d at 1181-82 (applying Washington law; cost-sharing provision identical to the one in this case); *LeLouis*, 230 F Supp 2d at 1223-24 (applying Oregon law); *ACORN*, 211 F Supp 2d at 1173-74 (applying California law; cost-sharing provision identical to the one in this case). Indeed, some courts have held that the existence of a cost-sharing provision amounts to a *per se* denial of access to the arbitral forum. *See Morrison*, 317 F3d at 658-59 (citing cases). Other courts have adopted a case-by-case approach. *See, e.g., id.* at 663. We need not choose between these two options, however, because, as we explain below, even under the option more favorable to defendant—the case-by-case option—the clause is unconscionable.

---

[5] *Green Tree* deals with federal civil rights statutes, but we see no reason why it should not be extended to state law involving, for example, predatory lending claims, as was done in *Smith v. Beneficial Ohio, Inc.*, 284 F Supp 2d 875, 879 (S D Oh 2003) (extending *Green Tree* to allegedly predatory lender using an arbitration clause identical to the one at issue in this case).

Denial of access to an arbitral forum occurs when the cost of arbitration is large in absolute terms, but also, comparatively, when that cost is significantly larger than the cost of a trial; otherwise, it is the existence of the claim itself and not the forum choice that deters the plaintiff. Defendant points out that the Court in *Green Tree*, while acknowledging the possibility that excessive arbitration costs could make an arbitration agreement unenforceable, also held that, because the record in that case was silent with respect to costs, it was "too speculative to justify the invalidation of the arbitration agreement." 531 US at 91. Thus, defendant argues, because plaintiffs in this case did not present any evidence that an arbitration would cost more than a trial, their claim that the cost-sharing term is unconscionable must fail.

We disagree. We find the court's reasoning in *LeLouis* to be persuasive:

> "The arbitration agreement in *Green Tree* did not specify the proportion of arbitration costs to be borne by the plaintiff, the organization that would conduct the arbitration, or the rules that would govern the arbitration. Consequently, the Court would not only have had to estimate the costs involved, but also had to speculate as to the manner in which those costs were to be divided. In the present case, although the specific fee schedule has not been determined, the allocation of costs is stated in the agreement."

*LeLouis*, 230 F Supp 2d at 1224. In this case, as in *LeLouis*, the arbitration agreement *does* allocate costs; no speculation in that respect is necessary. That being the case, we can state with confidence that plaintiffs' cost of arbitration would not only be high in the absolute sense—plaintiffs' estimate of $1,000, or six months' savings, stands uncontradicted—but high in comparison to a trial. That is because, regardless of whether filing fees are relatively equal in court and arbitration, the fact remains that most of the cost involved in an arbitration will be the arbitrator's fees; in court, by contrast, neither party has to pay for the judge. Under the terms of the arbitration, plaintiffs will have to pay half of the arbitrator's fee for the first day and all of the fees thereafter. That fact alone demonstrates that the cost-sharing provision is sufficiently onerous to act as a deterrent to plaintiffs' vindication of their claim. *Accord ACORN*, 211 F Supp 2d at 1174 (cost of

arbitrating claim under terms of arbitration rider identical to the one in this case would be "approximately ten times" cost of going to court); *Luna*, 236 F Supp at 1182 (same).

### c. Confidentiality

The arbitration rider provides, "The parties agree that the award shall be kept confidential." *Citing Ting*, 319 F 3d at 1151, the trial court ruled that the confidentiality provision is substantively unconscionable because such provisions "usually favor companies over individuals." Defendant maintains, however, that declaring confidentiality provisions unconscionable would render many arbitration agreements unenforceable and, further, that the provision is actually favorable to plaintiffs because it allows them and other borrowers to maintain the privacy of their financial affairs. *See, e.g.*, *Iberia Credit Bureau, Inc. v. Cingular Wireless*, 379 F3d 159, 175 (5th Cir 2004) ("Confidentiality can be desirable to customers.").

We conclude that the confidentiality provision is not only facially even-handed, but also roughly even-handed in effect. The argument in favor of unconscionability relies on the proposition that significant benefits in arbitrations flow to "repeat players." *See Ting v. AT&T*, 182 F Supp 2d 902, 932 (ND Cal 2002), quoting Llewellyn Joseph Gibbons, *Private Law, Public "Justice": Another Look at Privacy, Arbitration, and Global E-Commerce*, Ohio St J on Disp Resol 769, 786-87 (2000) (so concluding based on empirical data). "Repeat players," Gibbons theorizes, tend to accumulate large quantities of information regarding the preferences of arbitrators, the relative force of particular arguments, and the existence of precedential rulings. *See id.*; *Cole v. Burus Intern. Security Services*, 105 F3d 1465, 1476 (DC Cir 1997). One-time players can acquire access to the same information only if the results of arbitrations are public. Confidentiality provisions, therefore, favor repeat players by preserving their superior knowledge base. *Ting*, 319 F3d at 1151; *Luna*, 236 F Supp 2d at 1180-81; *ACORN*, 211 F Supp 2d at 1171-72.[6]

---

[6] One commentator argues:

"The typical arbitral requirement of privacy can itself be viewed as a substantive term that favors the company over the consumer. Where one party wants

Although there is some force to this argument, it fails to account for several countervailing considerations. First, the confidentiality provision in the present case does not apply to facts, parties, arbitrators' identities, arguments, or outcomes (in the sense of who wins and who loses); rather, it applies only to the amount of the award. Second, it fails to take into consideration the fact that the nonconfidential information, while not officially reported, is widely available to plaintiffs' lawyers through informal networks and organizations. Thus, any advantage conferred on repeat players and their counsel is marginal and, we conclude, it is roughly offset by the advantage that privacy about their financial affairs confers on plaintiffs.

### 4. *Severance or nonenforcement*

■ The arbitration rider is infected with serious procedural and substantive unfairness. Plaintiffs and defendant entered the agreement with significant disparity of bargaining power. Defendant affirmatively concealed key aspects of the agreement, including the fact that it called for mandatory arbitration with no opportunity for meaningful judicial review. Moreover, two of the provisions that it concealed—the class action ban and the cost-sharing requirement—conferred important benefits to defendant and imposed significant detriments to plaintiffs. In sum, the arbitration rider is unconscionable.

That being the case, the trial court could have severed the unconscionable provisions or declared the entire rider to be unenforceable. *See* ORS 72.3020(1) (so stating

---

publicity and the other party wants privacy, it is likely to be the plaintiff/consumer who favors publicity, as a way of informing others of the way in which she was harmed by an unethical broker, a negligent pest exterminator, or a careless doctor. The consumer may also wish to set a precedent to prevent the company from engaging in future similar wrongdoing or to publicize wrongdoing by the company. Further, a consumer's attorney often relies on public information gained from other lawsuits to build her own claims of negligent or intentional misconduct. Repeat-player companies can gain similar information through private channels. Thus, by requiring private arbitration the company may again deprive the consumer of certain relief she might have obtained through litigation."

Jean R. Sternlight, *Panacea or Corporate Tool?: Debunking the Supreme Court's Preference for Binding Arbitration,* 74 Wash U L Q 637, 686 (1996).

under UCC); *Restatement (Second) of Contracts*, § 184 comment b (1981). The trial court chose the latter option; defendant assigns error to that choice. In doing so, however, it faces the difficult task of persuading us that the court's decision was an abuse of discretion, that is, that the choice was not among the lawful alternatives available to the court. *State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000). We are not persuaded. The court explained its choice as resulting, at least in part, from the fact that the entire arbitration rider was "permeate[d]" with "significant procedural defects." As described above, we agree. Merely excising the offensive substantive provisions would not cure that unfairness; the resulting agreement would still have come about through unequal bargaining power and deception regarding the availability of judicial review.[7] Further, severing the unconscionable provisions would leave the arbitration rider with no provision regarding who would pay costs; to fill that gap, the trial court would have had to rewrite the contract. Thus, even if defendant is correct that the better option would have been to sever the unconscionable provisions—a proposition with which we do not agree—the trial court's decision to choose unenforceability was not an abuse of discretion.

## III.   DEFENDANT'S AFFIRMATIVE DEFENSE

■   As an affirmative defense, defendant claimed that plaintiffs were barred from recovering damages because they fraudulently induced defendant to enter into the loan transaction.[8] The defense was based on the allegation that plaintiffs, as part of their loan application, asserted that they had fully disclosed all of their outstanding financial obligations when, in fact, they knowingly concealed a tax liability to the federal government, with the intention that doing so would induce defendant to approve their loan application.

---

[7] An additional consideration is that curing unconscionable contracts by severing the unconscionable provisions provides those who draft such contracts no disincentive to including such provisions in the first instance.

[8] Defendant raised other affirmative defenses, the denial of only one of which is assigned as error: defendant's claim that plaintiffs' recovery was barred by the doctrine of unclean hands. Although defendant assigns error to the court's denial of that defense, it presents no argument for that assertion, and we therefore do not address it.

The trial court granted plaintiffs' motion for a directed verdict on the defense. Defendant renewed its argument by moving for a new trial after the jury returned its verdict. That motion was denied. Defendant assigns error to both rulings, and both assignments rest on the same theory.

According to defendant, plaintiffs had a financial liability to the federal government because their 1999 federal income tax returns, copies of which were submitted to defendant along with their loan application, fraudulently stated that each plaintiff was a head of household, each had two children, and that the four children were living with them. Those statements were misrepresentations, defendant contends, because plaintiffs are married and therefore cannot qualify as heads of households, and because they had nieces and nephews in Mexico but no children living with them. Because plaintiffs' tax returns contained these misstatements, they had a back-taxes liability that they should have disclosed.

The directed verdict for plaintiffs was appropriate only if they were entitled to prevail against the defenses as a matter of law on the basis of the evidence and all reasonable inferences that may be drawn from it, viewed in the light most favorable to defendant. *Shockey v. City of Portland*, 313 Or 414, 422-23, 837 P2d 505 (1992), *cert den*, 507 US 1017 (1993). Under that standard, we conclude that the trial court did not err.

That is so for several reasons. Most fundamentally, defendant does not even allege, much less attempt to prove, that plaintiffs had an actual undisclosed financial liability. Rather, defendant asserts that it "submitted ample evidence that * * * plaintiffs were aware of the *potential* tax liability." (Emphasis added.) That assertion is unaccompanied by any assertion that plaintiffs were asked to disclose *potential* liabilities or that defendant considered *potential* tax liabilities as relevant to its decision whether or not to make the loan. Nor is there any evidence that the *potential* tax liability, if there was one, would ever turn into an actual liability, that is, that the government would pursue penalties for underpayment or reimbursement for excessive refunds.

■ Over and above that fundamental flaw, defendant's argument has several additional shortcomings. To prevail on

its affirmative defense of fraud, defendant needed to prove by clear and convincing evidence "(1) a representation [by plaintiffs]; (2) its falsity; (3) its materiality; (4) [plaintiffs'] knowledge of its falsity or ignorance of its truth; (5) [their] intent that it should be acted on by [defendant] and in the manner reasonably contemplated; (6) [defendant's] ignorance of its falsity; (7) [defendant's] reliance on its truth; (8) [defendant's] right to rely thereon; (9) and [defendant's] consequent and proximate injury." *Conzelmann v. N.W.P. & D. Prod. Co.*, 190 Or 332, 350, 225 P2d 757 (1950); *OPERB v. Simat, Helliesen & Eichner*, 191 Or App 408, 423-24, 83 P3d 350 (2004). Defendant presented no evidence from a tax expert (or anybody else) that plaintiffs' tax returns were, in fact, false; without such evidence, and contrary to defendant's assertion that "[a] reasonable juror plainly would understand that such misconduct exposed plaintiffs to potential tax liability," a jury would have had no basis to conclude that a household can have only one "head"; that a "head of household" cannot be married; or that nephews and nieces living in Mexico cannot be claimed as children.[9] Thus, no reasonable juror could have found on the evidence presented that plaintiffs made a false representation. In addition, even if it could be inferred that plaintiffs made a false representation, there is no evidence from which a jury could infer that, because of that representation, they potentially owed money to the federal government and therefore concealed a potential liability. That conclusion would require facts showing that plaintiffs' tax liability as a childless married couple was more than their liability as two heads of household with two dependents each, *and* that the federal government did not, at the time of trial, owe plaintiffs a refund on some independent ground so as to offset any outstanding liability.

Further, defendant presented no evidence to contradict plaintiffs' testimony that they did not prepare or read their own tax returns, but had them prepared by a friend to whom they told nothing but true facts, and whom they instructed to prepare the returns accurately and honestly. Thus, no reasonable juror could have found that plaintiffs knew that their returns were false, if, indeed, they were. Nor

---

[9] Under 26 USC sections 152(b)(3)(A) and (d)(2)(E), nieces and nephews living in a country contiguous to the United States who meet other criteria qualify as "dependents."

did defendant present any evidence that plaintiffs submitted their tax returns to defendant, whose representative knew that they were married, with an intent to defraud *defendant* by concealing a potential liability. The tax returns were submitted for the purpose of verifying plaintiffs' income, not their marital status, and were submitted only because plaintiffs could not find W-2 forms. If the tax returns showed an intent to defraud, it was the federal government and not defendant that was the fraud's target, and the intent was to reduce a tax obligation, not to obtain a loan.

Finally, defendant presented no evidence that it had a right to rely on plaintiffs' allegedly false returns. Under Oregon law, a party asserting fraud must prove by clear and convincing evidence not only that it relied on the other party's misrepresentation, but that the reliance was reasonable under the circumstances. *OPERB*, 191 Or App at 428. One of the circumstances to be taken into consideration is the sophistication of the party asserting fraud.

> "[I]f a party is a large and sophisticated organization that has at its disposal a small army of attorneys, accountants and hired experts to evaluate a business deal, that party * * * probably 'ha[s] or can obtain equal means of information and [is] equally qualified to judge' the merits of a business proposition, thus making reliance on misstatements by another party unjustified. *Coy* [*v. Starling*, 53 Or App 76, 81-82, 630 P2d 1323, *rev den*, 291 Or 662 (1981)]."

*OPERB*, 191 Or App at 428. Here, the evidence demonstrates that defendant is a sophisticated organization that employs underwriters whose job includes reviewing loan applications for misrepresentation. Defendant's witness testified:

> "[W]e've always had a policy in regards to misrepresentation of information. If information is determined it might be misrepresented by the underwriter, they are to stop the underwriting process and escalate it up through their unit manager to the regional director level, where it is forwarded over to what is titled our fraud department for investigation."

The trial court ruled that, on these facts, no reasonable juror could find by clear and convincing evidence that defendant's reliance was reasonable:

"[I]t is clear that [defendant] had sufficient resources at its disposal to detect any existing liabilities plaintiffs had not disclosed either in their loan application or in their conversations with [defendant's] representative.

"Equally so, there is no evidence in the record that [defendant] could not have used these resources to investigate the discrepancies apparent from the information submitted to the underwriting department concerning plaintiffs' 2001 loan application, namely that plaintiffs' tax returns indicated that they were each claiming head of household status for 1999, although they were presently married and it was known that they had resided at the same residence for several years. Likewise, there was no evidence presented that it was reasonable for the underwriter to have overlooked these discrepancies. The same is true with respect to whether plaintiffs did or did not have the dependent children they claimed on their tax return."

We agree. Thus, for each of the reasons discussed, we hold that the court did not err in granting plaintiffs' motion for a directed verdict on defendant's affirmative defense of fraud. It follows that the court similarly did not err in denying defendant's motion for a new trial based on the assertedly erroneous grant of the directed verdict.

## IV. PUNITIVE DAMAGES

The jury awarded plaintiffs $31,639.73 in compensatory damages (including $5,000 in noneconomic damages) and $500,000 in punitive damages. Defendant filed a motion for remittitur, arguing that a punitive damages award of such magnitude violated the Due Process Clause of the United States Constitution and should be reduced to $100,000. Plaintiffs, in response, argued that the jury's award should stand. The trial court, applying the standards set out in *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 US 408, 123 S Ct 1513, 155 L Ed 2d 585 (2003), remitted the damages to $237,592.50, relying principally on the fact that the ratio between the punitive damages and compensatory damages awarded by the jury was approximately 15:1, whereas *State Farm* instructs that "few awards exceeding a single-digit ratio * * * will satisfy due process," *id.* at 425, and observed that a punitive damages award "of more than four times the amount of compensatory damages might be close to

the line of constitutional impropriety." *Id.* at 425 (citing *Pacific Mutual Life Insurance Co. v. Haslip*, 449 US 1, 23-24, 111 S Ct 1032, 113 L Ed 2d 1 (1991)). The trial court's award of $237,592.50 was approximately 7.5 times the amount of the actual compensatory damages that plaintiffs suffered. Defendant appeals, arguing that even a 7.5 to 1 ratio is excessive.[10] Plaintiffs cross-appeal, arguing that the jury's award was not excessive under any standard.

■　In reviewing an award of punitive damages, we "must resolve all disputes regarding facts and factual inferences in favor of the jury's verdict and then determine, on the facts as the jury was entitled to find them, whether the award violates the legal standard of gross excessiveness." *Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 556-57, 17 P3d 473 (2001). The latter question is a legal issue which we review for errors of law—what the federal courts call *"de novo"* review. *Waddill v. Anchor Hocking, Inc.*, 190 Or App 172, 176-77, 78 P3d 570 (2003).

■　The standard of gross excessiveness derives from the Due Process Clause, which prohibits punitive damages that are grossly excessive in relation to the state's legitimate interest in punishing unlawful conduct and deterring its repetition. *BMW of North America, Inc. v. Gore*, 517 US 559, 568, 116 S Ct 1589, 134 L Ed 2d 809 (1996). Determination of gross excessiveness has evolved into a more or less formulaic analysis summarized in *State Farm*. The appropriate guideposts for a court to consider are "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual and potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." 538 US at 418. To determine a defendant's reprehensibility, *State Farm* instructs courts to

---

[10] Defendant argues only that the amount of the award violates its rights under the substantive aspect of the Due Process Clause; it does not argue that the court violated its rights under the procedural aspect of the clause. *See Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 550 n 9, 17 P3d 473 (2001) (explaining difference).

"consider[ ] whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."

*Id.* at 419.

The second guidepost requires an examination of the ratio between the compensatory and punitive damages. Although the United States Supreme Court has rejected the notion that constitutionality may be determined by application of a simple mathematical formula, *Gore*, 517 US at 582; *Haslip*, 499 US at 18, the Court, as noted above, has provided numerical guidelines: "[F]ew awards exceeding a single-digit ratio * * * will satisfy due process," *State Farm*, 538 US at 425, and a punitive damage "award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety," *id.* (citing *Haslip*, 499 US at 23-24). The Court noted, however, that "ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" *State Farm*, 538 US at 425 (quoting *Gore*, 517 US at 582).

The final guidepost instructs courts to compare the punitive damages awarded to the amount of the civil penalties that could have been imposed as a result of the defendant's conduct. If a defendant is liable for significant civil sanctions, a larger punitive damage award may be justified. However, the Court has not placed strict limits on the ratio between punitive damages and civil penalties. *See State Farm*, 538 US at 428-29 (indicating that a punitive damage award of $1 million dollars may be appropriate, although the only applicable civil sanction was a $10,000 fine for fraud).

■   We begin our analysis with the second *State Farm* factor, because it loomed large in the trial court's analysis and because defendant's challenge focuses on it exclusively. As noted above, the trial court calculated that the jury's punitive damages award of $500,000 was approximately 15 times as large as the compensatory damage award. In doing so,

however, the court used actual damages, that is, the noneconomic damages plus the amount of money that plaintiffs paid defendant, over and above what they would have paid absent fraud, before they successfully refinanced the loan with another mortgage company. That was error. Under binding precedent from both the United States Supreme Court and the Oregon Supreme Court, the appropriate denominator in the punitive-to-compensatory ratio calculation is the amount of *potential* compensatory damages. In *Haslip*, the Court approved a standard comparing "the punitive damages award and the *harm likely to result* from the defendant's conduct as well as the harm that actually has occurred." 499 US at 21 (emphasis added). In *TXO Productions Corp. v. Alliance Resources Corp.*, 509 US 443, 460, 113 S Ct 2711, 125 L Ed 2d 366 (1993), the Court held, "It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded." (Emphasis in original.) Again, in *State Farm*, 538 US at 418, the Court directed the attention of reviewing courts to "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award[.]" In *Williams v. Philip Morris Inc.*, 340 Or 35, 127 P3d 1165, *cert granted*, ____ US ____ , 126 S Ct 2329 (2006), the Oregon Supreme Court explicitly interpreted *State Farm* as calling for the use of potential damages in the denominator of the ratio. *Id.* at 60 ("To determine the denominator of the ratio, we consider not only the harm actually suffered by plaintiff, but also the potential harm to plaintiff.").

Defendant argues that we should not use potential damages as the denominator because "[t]he cases where potential harm is used as the base figure are typically those where the defendant undertakes no effort to mitigate or prevent the harm, and the potential harm avoided might have been catastrophic." Here, by contrast, defendant "voluntarily waived a pre-payment penalty, before the lawsuit was filed, to mitigate the harm," and, presumably, the potential harm to plaintiffs was not "catastrophic." Even if defendant's theory about what kind of cases should focus on potential harm were valid—a theory which they support only by unelaborated "*see*" citations to a California case (*Simon v. San Paolo*

*U.S. Holding Co., Inc.*, 35 Cal 4th 1159, 1174 n 3 and 1177, 113 P3d 63 (Cal 2005)), a case from the Court of Appeals of Louisiana (In re *New Orleans Train Car Leakage Fire*, 795 So 2d 364, 386 (La Ct App 2001)), and *TXO*, 509 US at 460 (which does not involve either mitigation or catastrophe)—it would not help them here. Although defendant ultimately did waive plaintiffs' prepayment fee, it told their new mortgage broker, when plaintiffs were still unrepresented by counsel, that it would *not* do so, and "voluntarily" agreed to waive the fee only after plaintiffs hired an attorney and he persuaded them to do so during negotiations. And, if defendant's "wrongful plan had succeeded," *TXO*, 509 US at 460, the results *would* have been catastrophic, at least to plaintiffs: unable to make their mortgage payments to defendant and also pay their real estate taxes, they would have lost their home.

We therefore conclude that we must compare the potential damages to the punitive damages. Plaintiffs argued below, and argue again on appeal, that the appropriate figure for potential damages is $326,751.57, the amount of interest defendant would have earned over the life of the loan. Defendant did not respond to that argument at trial. For the first time on appeal, in a footnote in its reply brief, defendant argues, without elaboration, that a more appropriate measure is "the difference in interest between the [c]onsolidated [l]oan [from defendant] and [plaintiffs'] two mortgages before they refinanced"—an amount that defendant either does not know or does not choose to share. We therefore accept plaintiffs' figure and, as a consequence, conclude that the ratio between the jury's punitive damage award ($500,000) and the potential compensatory damages ($326,751.57) is approximately 1.53 to 1.

Whether such a ratio is permissible depends on the reprehensibility of defendant's conduct; the more reprehensible the conduct, the higher the permitted ratio. *State Farm*, 538 US at 425. Thus, in *Williams*, where the defendant tobacco company was found to have engaged in a 40-year campaign of fraud resulting in the suffering and death not only of the plaintiff's decedent but of other Oregonians as well, the Court of Appeals noted, "[I]t is difficult to conceive of more reprehensible misconduct for a longer duration on the

part of a supplier of consumer products to the Oregon public," and approved a ratio of over 90 to 1, *Williams v. Philip Morris Inc.*, 193 Or App 527, 562, 92 P3d 126 (2004), and the Oregon Supreme Court affirmed, *Williams*, 340 Or at 64. On the other hand, in *Goddard v. Farmers Ins. Co.*, 202 Or App 79, 120 P3d 1260 (2005), *adh'd to on recons*, 203 Or App 744, 126 P3d 682, *rev allowed*, 341 Or 366 (2006), where the defendant insurance company was found to have engaged in a bad faith failure to settle within policy limits, the court held that a punitive damage award of three times the compensatory damages was the maximum permissible under the constitution.

Thus, a punitive-to-compensatory damages ratio of 1.5 to 1 would be appropriate in a case of only moderate reprehensibility (if that is not in itself an oxymoron). Here, we have such a case. *State Farm*, as noted, suggests five factors that might be considered in gauging reprehensibility:

> "whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."

538 US at 419. As the parties agree, two of these factors are implicated in this case: plaintiffs were financially vulnerable, and defendant's conduct involved intentional trickery and deceit. Its employee actively solicited plaintiffs. After learning that they were satisfied with their current loan, he convinced them to take out a significantly less advantageous one by lying to them about the new loan's terms. As a result, they suffered not only financial loss, but anxiety about the apparently potential repossession of their home for nonpayment of real estate taxes. We conclude that, even though plaintiffs experienced no physical injury and presented no evidence that defendant engaged in repeated instances of deceit, a punitive damages award amounting to only 1.5 times the potential compensatory damages was appropriate to the level of reprehensibility. *Compare Goddard*, 202 Or App at 122 (solely financial harm; court approved 3:1 ratio).

The third *State Farm* factor, a comparison of the punitive damages award and civil penalties authorized in comparable cases, 538 US at 428, reinforces our conclusion that the jury's original award was not constitutionally infirm. The Oregon Supreme Court has provided the following instruction regarding the "comparable sanctions" guidepost:

> "[T]he 'comparable sanctions' guidepost requires three steps. First, courts must identify comparable civil or criminal sanctions. Second, courts must consider how serious the comparable sanctions are, relative to the universe of sanctions that the legislature authorizes to punish inappropriate conduct. Third, courts must then evaluate the punitive damage award in light of the relative severity of the comparable sanctions. The guidepost may militate against a significant punitive damage award if the state's comparable sanctions are mild, trivial, or nonexistent. However, the guidepost will support a more significant punitive damage award when the state's comparable sanctions are severe."

*Williams*, 340 Or at 58.

Although neither party nor *amicus* points to ORS 59.930, that statute provides:

> "It is unlawful for any person, directly or indirectly, in connection with the conduct of a mortgage banker or mortgage broker business:
>
> "(1) To employ any device, scheme or artifice to defraud;
>
> "(2) Knowingly to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."

Violation of the statute is a Class C felony. ORS 59.992(1). It is therefore punishable by up to five years' imprisonment, ORS 161.605, or a fine of $125,000, ORS 161.625. In addition to those penalties, a person who violates ORS 59.930 "shall be subject to a penalty of not more than $5,000 for every violation. * * * [I]n the case of a continuing violation, each day's continuance is a separate violation, but the maximum penalty for any continuing violation shall not exceed $20,000 for each offense." ORS 59.996. It is beyond dispute, then, that

the punitive damages awarded by the jury cannot be questioned as disproportionate to the sanctions that defendant could have received and of which it therefore was or should have been aware. *See Williams*, 340 Or at 58-60 (noting that, although criminal sanctions should be relied on only with care, they are nonetheless relevant); *Groth v. Hyundai Precision and Ind. Co.*, 209 Or 781, 791, 149 P3d 333 (2006).

## V. ATTORNEY FEES

■ As prevailing parties on their TILA claim, plaintiffs are entitled to an award of reasonable attorney fees. 15 USC § 1640(a)(3). The trial court awarded plaintiffs $182,107.50. It arrived at that figure by multiplying the number of hours spent on the TILA claim by the hourly rate charged by the various attorneys who worked those hours. Defendant does not contest the number of hours or the method of calculation insofar as it is a product of hours times rates; rather, defendant objects to the trial court's decision to apply a "multiplier factor" to the attorneys' standard billing rates. Instead of using the standard rates of $250 for partners and $135 to $140 for associates, the court used a rate of $322 for partners and $207 for an associate.

TILA attorney fee awards are governed by federal law. *Long v. Storms*, 52 Or App 685, 688, 629 P2d 827 (1981). That body of law requires the so-called "lodestar" method, under which attorneys' fees are

> "calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate. Although in most cases, the lodestar figure is presumptively a reasonable fee award, the * * * court may, if circumstances warrant, adjust the lodestar to account for other factors which are not subsumed within it."

*Ferland v. Conrad Credit Corp.*, 244 F3d 1145, 1149 n 4 (9th Cir 2001) (citations omitted). Factors that may support a deviation from the lodestar amount include

> "(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case,

(5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases."

*Kerr v. Screen Extras Guild, Inc.*, 526 F2d 67, 70 (9th Cir 1975), *cert den*, 425 US 951 (1976); *accord Ferland*, 244 F3d at 1149 n 4. The facts underlying a court's attorney fee decision are reviewed for any evidence. *State High. Com. et al v. Kendrick et al*, 227 Or 608, 613, 363 P2d 1078 (1961). The award itself is reviewed for abuse of discretion. *Squier Associates, Inc. v. Secor Investments, LLC*, 196 Or App 617, 622, 103 P3d 1129 (2004).

In this case, the trial court increased the fee award based on evidence submitted by plaintiffs "establish[ing] that few lawyers in [Oregon] are willing to represent clients in unfair or predatory mortgage lending cases because they are financially risky and involve complex issues," and "the firm's exclusive work on this case in January required the firm to decrease the number of potential new client intake interviews by 1/3." Those factual findings are amply supported by evidence in the record.

As required, the trial court calculated the attorney fee award according to the lodestar method and adjusted the hourly rate based on factors established by federal law and attested to by uncontradicted evidence. Accordingly, we conclude that the trial court's attorney fee award was not an abuse of discretion.

## VI.   CONCLUSION

In sum: The trial court correctly decided that it, and not an arbitrator, should decide whether the arbitration rider was unconscionable, because the claim against the arbitration rider was distinct from the claim against the contract itself; further, the court then correctly decided that the arbitration rider was unconscionable, based on the oppressive circumstances of its formation, as well as its ban on class actions and its cost-sharing provisions. The trial court also correctly granted plaintiffs' motion for a directed verdict on

defendant's affirmative defense based on an allegation of fraud; on the evidence presented, no reasonable juror could have found clear and convincing evidence that plaintiffs intended to defraud defendant by submitting, as proof of their income, federal income tax returns with allegedly (but not demonstrably) erroneous information regarding their marital status and family. The court did err, however, in remitting the jury's punitive damage award, because the court based its decision on the ratio between the punitive damages award and the actual damages suffered, instead of the ratio between the punitive damages and the potential damages. Finally, the court did not abuse its discretion in awarding plaintiffs attorney fees based on enhanced hourly rates.

On appeal, affirmed. On cross-appeal, reversed and remanded with instructions to enter judgment awarding punitive damages in the amount found by jury.